UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :   Docket No.: 15-CR-66 (LTS)
    -v-                                             :
                                                    :
ILYA PETROV, and                                    :
SUREN GADAYEV                                       :
                                                    :
           Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# ILYA PETROV'S OMNIBUS PRETRIAL MOTIONS

CREIZMAN PLLC
Eric M. Creizman
Melissa Madrigal
565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5022
Email: ecreiz@creizmanllc.com
       mmadrigal@creizmanllc.com

Attorneys for Ilya Petrov

May 15, 2015

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................. 1

    I.   The Extortion Charges ...................................................................................... 1

    II.   The Alleged Offense Conduct .......................................................................... 1

    III.   Petrov's Post-Arrest Statement ........................................................................ 5

    IV.   Gadayev's Post-Arrest Statement .................................................................... 7

ARGUMENT .................................................................................................................... 8

    I.   The Court should sever the trials of Petrov and Gadayev. .............................. 8

A. Petrov is entitled to severance because admission of Gadayev's post-arrest statements will violate Petrov's Sixth Amendment right of confrontation ......... 8

B. Petrov is entitled to a severance to prevent the substantial risk of wrongful conviction due to mutually antagonistic defenses. ............................................ 10

    II.   The Court should suppress Petrov's post-arrest statement. .......................... 12

CONCLUSION ............................................................................................................... 14

We respectfully submit this memorandum of law on behalf of Ilya Petrov in support of his pretrial motions for a severance under Rule 14 of the Federal Rules of Criminal Procedure, and to suppress his post-arrest statements on the basis that they were elicited in violation of his right to counsel, which he had expressly

**STATEMENT OF FACTS**

I. **The Extortion Charges**

Ilya Petrov and Suren Gadayev are charged in a two-count indictment (the "Indictment") charging them with one count of conspiracy to commit extortion under 18 U.S.C. § 1951 and one substantive count of extortion under 18 U.S.C. § 1951. The Indictment alleges that from November 2014 through January 25, 2015, Petrov and Gadaev participated in a scheme to extort, and attempted to extort, an "individual" (the "Confidential Informant" or "CI") by using "threatened force" in order to "collect payment" from the CI "for a real estate deal in which Petrov and Gadayev lost money." *See* Indictment ¶¶ 1, 2. Petrov and Gadayev were arrested on January 26, 2015 pursuant to a criminal complaint (the "Complaint"). Although the Indictment provides scant detail concerning the alleged offense conduct, the Complaint provides additional particulars.

II. **The Alleged Offense Conduct**

According to the Complaint, the CI was arrested in 2009 and pled guilty to mail and wire fraud charges. (Complaint ¶ 3). After the CI was charged with those crimes, he began cooperating with authorities. (*Id.*). The CI continued to provide information to the FBI after his case concluded. (*Id.*).

The CI was acquainted with Petrov and Gadayev. (*Id.*). In the summer of 2013, Gadayev told the CI that he was having financial difficulties and offered to provide him "security." (*Id.* ¶ 7). Although the CI told Gadayev that he did not require Gadayev's

"security" services, he offered to help Gadayev by teaching Gadayev how to make money as the CI had done through his business: by "flipping" real estate properties; in other words, buying, renovating, and selling properties for profit. (*Id.* ¶ 7(a)).

The CI told Gadayev that he could get him started in the real estate business quickly because the CI had recently arranged to purchase a property in Mastic Beach, New York. (*Id.* ¶ 7(b)). The CI offered to assign Gadayev the rights to the property and help Gadayev renovate and resell the property. (*Id.*). According to the Complaint, the CI only asked for Gadayev to pay him the amount the CI deposited into escrow, and therefore would not take any profit for himself. (*Id.*).

Gadayev accepted the CI's offer and, shortly thereafter, informed the CI that he had brought Petrov in as his business partner to purchase and flip the property. (*Id.* ¶ 7(c)). The CI discussed the business arrangement with Petrov, and Petrov told him that he would be taking out loans from associates in the diamond industry to finance the purchase of the property. (*Id.*). As the parties had agreed to, in exchange for Gadayev and Petrov's reimbursement of the CI's deposit, the CI transferred the Memorandum of Sale for the property to a corporation Gadayev and Petrov opened for the purposes of flipping the property. (*Id.* ¶ 8). Gadayev and Petrov purchased the property on December 12, 2013 for $51,500. (*Id.*).

Gadaev and Petrov then went about renovating the Mastic Beach property, using contractors recommended by the CI. (*Id.* ¶ 9(a)). The renovations cost more than Gadaev and Petrov had anticipated, and they had to take out additional loans to cover the renovations. (*Id.* ¶ 9(b)). Although the CI found a buyer for the property, the purchase price was less than the amount Gadaev and Petrov had invested into the purchasing and

2

renovating the property, about $35,000 less according to Petrov's calculations. (*Id.*). Petrov told the CI that he should cover their losses because Petrov claimed the CI had promised to cover any losses that Gadayev and Petrov incurred in the transaction. (*Id.* ¶ 9(d)). The CI told Petrov he would not cover the loss. (*Id.*).

In coordination with the FBI, the CI arranged to meet Petrov and Gadaev outside of a Burger King on November 14, 2014. (*Id.* ¶ 10(d)). Prior to the meeting, the CI was given an audio recording device by the FBI to record the conversation. (*Id.*). FBI agents also conducted surveillance of the meeting. (*Id.*). During that meeting and in a series of recorded meetings that followed, Petrov told the CI that the CI had made a promise to cover his and Gadayev's losses on the purchase, renovation, and sale of the property, and that the CI had a moral obligation to honor that promise. As the government concedes, "Petrov did not literally say he would commit violence against the [CI] and that, at points, he made sure to tell the [CI] that he was not threatening him." (*See* 15-981-cr (2d Cir.), Dkt. # 27 ¶ 20)). The government nevertheless contends that Petrov was making veiled threats because his statements were made "against the backdrop of Petrov's efforts two years earlier to collect a [$3,000] from the [CI's] cousin through threats of violence." (*Id.*¶ 7). (*See also* Complaint ¶¶5-6).

On November 24, 2014, the CI placed a recorded call to Gadayev in the presence of the FBI agents. Petrov was not a participant on the call. During that conversation, Gadayev allegedly said, among other things (according to an FBI-prepared transcript of the conversation, much of it translated from Russian):

> • You are going to a wrong direction [UI] . . . wrong direction, do you understand me? Let me explain it to you. You'd rather close it down [U/I] because you know what type of principal is he going to have? I'll tell you it now, because I know what is going to happen. You don't know the guy like I know. I am trying

3

to hold back everything [U/I] in order everything to go in a peaceful way. He did not earn anything [UI] I've already told you—if he thinks [UI[ it is my loss, it is not his loss, it is not your loss, it is my loss.

• You told me personally that this Sunday you are going to close ten thousand. You would have been over. That's it. He did not show up on closing and everything is over, everything; [UI] I am . . . If you feel like it's my loss, I am going to reimburse you, but right now, I can't. It is better for you close it. I am telling you now. There is nothing going on unless it gets personal. You understand? He is going to push it personal, because if it does not get closed, his face is on the line. You should understand it properly. He took money from somebody. I am not lying to you.

(*See* Complaint ¶¶ 12-13).

The CI also made several recorded calls to Petrov, in which Petrov requested, and the CI appeared to agree, that the CI would pay Petrov and Gadaev $12,000 to cover their losses. (*Id.* ¶ 14). On December 22, 2014, Petrov and the CI met at the CI's attorney's office, and the CI wrote Petrov and Gadayev's corporation two checks for $6,000 each. (*Id.*) One of the checks was dated for December 22, 2014, and the other check was postdated for January 15, 2015. (Complaint ¶ 16). According to the Complaint, after the December 22, 2014 meeting, the FBI agent asked the CI to stop payment on the checks. (*Id.* ¶ 17). By the time the CI tried to issue a stop payment, however, Petrov had already deposited the first check, which had cleared. (*Id.*). The CI successfully stopped payment on the January 15, 2015 check. (*Id.*).

On January 14, during a recorded conversation between the CI and Petrov, Petrov told the CI that he planned to deposit the January 15 check the following day, and the CI told Petrov that it was fine for him to do so. On January 22, 2015, Petrov called the CI, and the CI recorded the conversation. (*Id.* ¶ 20). Petrov asked why the CI stopped payment on the check, and the CI answered that he stopped payment because he felt that he did not owe Petrov any money. (*Id.*). Petrov expressed his displeasure that the CI

4

stopped the check after telling Petrov that he could deposit it. (*Id.*) Petrov and the CI then engaged in the following exchange (*See* Creizman Decl. ¶ 4):

> PETROV: I am not going to let it go. And I don't know, I don't know what's what but you better resolve that issue. . . .
>
> \*\*\*
>
> CI: You [UI] said don't threaten me, Ilyush. [UI]
>
> PETROV: Hold on. Who's threatening you? Number one. And this conversation is been recorded. . . .
>
> \*\*\*
>
> PETROV: Who's threatening you? Yes! Me say I'm not gonna leave it alone that doesn't mean I'm not gonna get my money. Who's threatening you?
>
> \*\*\*
>
> CI: Uh I am not gonna get extorted by you I tell you right now.
>
> \*\*\*
>
> PETROV: Extorting you! All I said I am not gonna leave it alone. What's that mean?].

According to the Complaint, later that evening, Gadayev visited the CI's father's house. (¶ 21). Gadayev was allegedly angry about the bounced check. (*Id.*). Among other things, Gadayev allegedly told the father, without prompting, that Petrov would not hurt the CI. (*Id.* ¶ 21(d)).

### III. Petrov's Post-Arrest Statement

According to the FBI's arrest log, Petrov was arrested at his home at approximately 7:10 a.m. on January 26, 2015. (Creizman Decl. Ex. A). After arriving at the FBI Office, Petrov was orally read his rights and was provided with an Advice of Rights Form, FBI Form FD-395. (*Id.*). Although Petrov wrote his initials on the form, reflecting that he understood his rights, he did not sign the "consent" to answer questions without a lawyer present. (Creizman Decl. Ex. B). At approximately 9:51 a.m., the

5

agents brought Petrov into a conference room for an interview and read Petrov his rights a second time. Petrov said that he wanted to know why he was arrested, but that "[d]uring questions, I would like to have my attorney present." (Creizman Decl. ¶ 4). Petrov explained that the reason he wanted an attorney to be present is that it appeared he was facing serious charges, and reiterated that he "would like my attorney to be present." The agents advised Petrov that they would not conduct an interview because he indicated that he wanted a lawyer present.

Petrov then said that he did not understand why he was being charged with extortion. Special Agent Richards responded that at this point, Petrov should understand which extortion "we are talking about." He then described the two alleged extortions Petrov was charged with (the CI and the CI's cousin). Special Agent Richards then said that they could talk with Petrov in more detail if he wanted to, but Petrov would first have to sign the waiver of rights form. Petrov again asked why he was arrested. Special Agent Richards answered that, "right now," the Complaint charged Petrov with the two extortions. Both Special Agent Richards and Special Agent Hardison then said that they knew about other extortions" and "we've got all those," and said a few different names. Special Agent Richards said that Petrov was then charged only with the extortions of the CI and the CI's cousin, but the other extortions would probably be charged later. Special Agent Richards told Petrov that "your greatest opportunity to help yourself and perhaps help our investigation grow and get better is greatest right now." He further advised Petrov that he should consider himself like a stock, that "every second that ticks by your value diminishes." Petrov once again stated that "I would like to have my attorney present."

Petrov went on to explain that he was not trying to be difficult and then began to discuss the facts of the case. Petrov and the agents engaged in back-and-forth question and answer exchanges about the facts of the case, interspersed with numerous instances of the agents asking Petrov whether he wanted to talk and Petrov reiterating that he wanted to have an attorney present. The agents ultimately terminated the interview.

## IV. Gadayev's Post-Arrest Statement

Gadayev also participated in a post-arrest interview with the agents, in which he made the following statements (*see* Creizman Decl. ¶ 5):

- Petrov and the CI had many conversations without Gadayev being present and therefore Gadayev did not know if Ilya ever made any threats to the CI outside of Gadayev's presence.

- In face-to-face meetings between Petrov and the CI, where Gadayev was present, Petrov never threatened Gadayev because Gadayev "controlled the situation."

- Gadayev tried to keep it peaceful, not just for Petrov, but for "everybody."

- God knows what's in Petrov's head, but when Gadayev is present, Gadayev is in control and nothing would happen to the CI when Gadayev was present.

- Gadayev would not be able to control Petrov from doing something to the CI if he was not around.

- The word is out there that Petrov hired someone to beat the CI's cousin but Gadayev did not think so, because he believed Petrov "would do it himself it came down to it."

- Gadayev does not know what Petrov does when people owe him money.

- Gadayev told the CI that he wanted to keep it peaceful but "I can only talk for myself."

- Gadaev has heard of Petrov's reputation but does not believe Petrov is the person some people say he is.

- The CI had the right to be afraid of Petrov.

7

- Gadayev never heard Petrov say that he would hire someone to hurt an individual, and does not think he would, but if Petrov were to hurt anyone, he would do it himself, not hire anyone to do it.

- The CI's cousin called him after he was assaulted and asked Gadayev to accompany him to meet with Petrov, because he owed Petrov money and did not feel safe meeting with Petrov alone.

- The CI said that he owed Petrov money and that Petrov had threatened him and that the CI threatened Petrov in return, so he wanted Gadayev to be present at their meeting.

- Petrov never told Gadayev that he had anything to do with the assault on the cousin. The cousin called Gadayev and said that he wanted to meet with Petrov. Petrov did not initiate the meeting.

## ARGUMENT

**I. The Court should sever the trials of Petrov and Gadayev.**

Severance is warranted where joinder of co-defendants in an indictment is likely to prejudice a defendant. Fed. R. Crim. P. 14(a). A motion for severance under Rule 14 requires a court to balance judicial efficiency against the potential for prejudice. *See, e.g., United States v. Hatcher*, 680 F.2s 438, 442 (6th Cir. 1982). "The risk of prejudice associated with joinder varies with the facts of each case." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003). Where the risk of prejudice is high, the Court should grant a motion for severance under Rule 15. *Zafiro v. United States*, 506 U.S. 534, 539 (2d Cir. 2003).

**A. Petrov is entitled to severance because admission of Gadayev's post-arrest statements will violate Petrov's Sixth Amendment right of confrontation.**

A defendant has a constitutional right "to be confronted with the witnesses against him." U.S. Const. Am. VI. The right of confrontation includes the right to cross-examine. Indeed, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing

8

in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). A defendant's Sixth Amendment right is compromised when the government introduces an out-of-court confession or other statement by a non-testifying co-defendant that implicates the defendant at their joint trial. *Bruton v. United States*, 391 U.S. 123 (1968). "To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly, but may contain an accusation that is only implicit." *Mason v. Scully*, 16 F.3d 38, 42-43 (2d Cir. 1995). A court must ensure strict compliance with *Bruton* or hold separate trials. *See, e.g., Gray v. Maryland*, 523 U.S. 185, 194 (1998); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Gadayev's post-arrest statements listed above are particularly troublesome because they are facially inculpatory with respect to Petrov. Those statements plainly suggest that Petrov is prone to violence, and that without Gadayev's intervention, Petrov likely would have committed violence or threatened violence against the CI. Furthermore, Gadayev's statements concerning Petrov's alleged participation in the assaults on the CI's cousin both corroborate the prosecution's theory that Petrov was indeed involved in those assaults and bolster the notion that Petrov's otherwise facially innocuous statements would reasonably be viewed by the CI as threatening.

Although the "confrontation problem may be avoided by redacting the codefendant's statement so that it is no longer connected to the nondeclarant defendant" (*United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995)), no redacting here can avoid incriminating Petrov and violating his rights under *Bruton*. Redaction will not, and cannot, cure the *Bruton* problem here because the jury will clearly know from the context

of those statements that Gadayev was referring to Petrov.  *See, e.g., Gray*, 523 U.S. at 197.

Because the government will likely seek the admission of Gadayev's post-arrest statements, and redaction cannot cure the *Bruton* problem, a severance is warranted.

**B. Petrov is entitled to a severance to prevent the substantial risk of wrongful conviction due to mutually antagonistic defenses.**

A severance is merited where a joint trial would deprive one or more defendants of a fair trial.  *See, e.g., United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991). Where defendants seek to present antagonistic defenses that are mutually exclusive—such that a jury's acceptance of one defendant's defense necessarily requires "it convict a second defendant,"—a defendant is deprived of a fair trial and severance is required.  *Id.* at 484.  *See also, United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (Although mutually antagonistic or irreconcilable defenses are not prejudicial *per se*, they "may be so prejudicial in some circumstances as to mandate severance.").  As the Ninth Circuit observed,

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant.  In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant.  The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor.  Opening statements . . . can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant. . . .  Counsel can make and oppose motions that are favorable to their defendant, without objection by the government.
>
> Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilty of the other defendant or to help rehabilitate a witness that has been impeached. . . .  The presentation of the codefendant's case becomes a separate forum in which the defendant is accused and tried.  Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime.

*United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991).

The unfairly prejudicial circumstances described in *Tootick* are substantially likely to occur in a joint trial here because Gadayev's and Petrov's defenses are mutually exclusive. Indeed, Gadayev's post-arrest statement includes assertions that he was merely trying to keep the dispute with the CI peaceful, and that he attempted to protect the CI from Petrov. Consistent with that theory, Gadayev's counsel has argued that his client's recorded communications with the CI cannot be perceived as threats, and, to the contrary, "[a]ll the statements made is that he wants to be peaceful." (Dkt. # 23-2 at 5-6). Thus, it is likely that Gadayev will argue that he was trying to protect the CI when he encouraged the CI to cover the losses on the investment in the property (i.e., "You don't know the guy like I know."). Indeed, Gadayev will argue that the fact he offered to reimburse the CI for any payments the CI made to Petrov demonstrates that he was working at cross-purposes with Petrov, not conspiring with Petrov to extort the CI.

As we have demonstrated in our arguments for bail, nowhere on the recorded conversations does Petrov ever say he would commit violence against the CI, and, to the contrary, Petrov repeatedly and expressly disclaims any intention to harm him. Petrov's defense will therefore be that there is no evidence of him making any threats toward the CI. Gadayev's likely defense that he was trying to protect the CI by telling the CI to cover their losses thus bolsters the government's contention that although Petrov did not explicitly threaten the CI with violence, he was making *veiled* threats of violence to the CI. In this way, Gadayev will become a "second prosecutor" of Petrov at a joint trial.

Accordingly, because the likely defenses of Gadayev and Petrov are irreconcilable, a severance is warranted. *See, e.g., United States v. Copeland*, 336 F. Supp. 2d 223 (E.D.N.Y. 2004) (ordering severance because the jury "cannot logically

11

accept both [defendant's] defenses as true: Copeland's theory of defense (i.e., he was not involved in the bank robbery) is mutually antagonistic to Vasquez's theory (i.e., Copeland—not Vasquez—entered the bank to commit the robbery)."); *United States v. Basciano*, 2007 WL 3124622, at *8 (ordering severance because "the defenses are more than merely inconsistent; they are in direct conflict.").

## II. The Court should suppress Petrov's post-arrest statement.

Statements made by a defendant in the course of custodial interrogation are generally inadmissible absent waiver of the rights specified in *Miranda v. Arizona*, 384 U.S. 436, 489 (1966). When a defendant explicitly invokes his right to counsel, he is entitled to additional safeguards to protect against waiver of that right: "a valid waiver of [the right to counsel] cannot be established by showing only that the [defendant] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Rather, an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation until counsel has made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*.

A bare inquiry about the charges underlying an arrest, however, "relates to routine incidents of the custodial relationship" and "will not generally 'initiate' a conversation" for the purposes of validly waiving the right to counsel. *United States v. Perez*, 946 F. Supp. 1191, 1199 (S.D.N.Y. 1996) (quotations omitted). The opinion in *Perez* is instructive. There, after being read his *Miranda* rights at FBI headquarters, the defendant invoked his right to remain silent and his right to counsel. *Id.* at 1198. He then asked what he was being charged with, and the agents gave him a general response and told the

12

defendant, "we know you are a Latin King." *Id.* The defendant then said that "he was no longer a member of the Latin Kings and had last been with them in 1993." *Id.* at 1194.

The court suppressed that statement despite the fact that the defendant technically "initiated" conversation by asking what the charges were, because the defendant's "routine inquiry" about his charges could not be deemed to have initiated "the particular verbal exchange which lead to his statement to the officers." *Id.* at 1199. Rather, the court held that the agents had improperly engaged in further interrogation by "positing the guilt" of the defendant ("we know you are a Latin King") in an attempt to elicit a statement from him. *Id.* at 1198. Furthermore, the court held that even if the defendant "had initiated a discussion in asking about the charges," the government had not demonstrated that the question effected a valid waiver of his rights because the circumstances indicated that the defendant did not intend a waiver, including that he "declined to sign the FBI's waiver-of-rights form." *Id.* at 1199.

The same result should obtain here. When Petrov was brought into the interrogation room and asked to sign the advice-of-rights form, Petrov declined and said that he wanted to have his attorney present. Thereafter, even at the agents' prodding, Petrov repeatedly declined to sign the form and repeatedly invoked his right to counsel. Like the defendant in *Perez*, the fact that Petrov asked why he was being charged with extortion did not effect a valid waiver of his right to counsel. Rather, the statements Petrov made about the case were prompted by the agents repeated efforts to elicit incriminating statements by "positing his guilt." The agents' response to Petrov's question about the charges—including that Petrov knew which extortion they were talking about, and that they knew about other extortions, which would likely be charged

13

in due course—were designed to, and responsible for, Petrov making statements after he invoked his right to counsel and demonstrated that he did not intend to waive that right.[1]

Accordingly, Petrov's post-arrest statements should be suppressed.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Petrov's motions for a severance under Fed. R. Crim. P. 14(a) and to suppress his post-arrest statements because they were elicited in violation of his *Miranda* rights.


Dated: May 13, 2015
      New York, New York

/s/ Eric M. Creizman_____
Eric M. Creizman (EC 7684)
Melissa Madrigal (MM 0200)
CREIZMAN PLLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5022
Email: ecreiz@creizmanllc.com
      mmadrigal@creizmanllc.com

Attorneys for Ilya Petrov

---

[1] *See also, United States v. Carey*, 1991 WL 12200, at *5 (S.D.N.Y. Jan. 31, 1991) (suppressing statements where officer "raised the subject of [defendant's] involvement with narcotics without any indication that [defendant] had waived his *Miranda* rights and after he had previously invoked his Fifth Amendment rights.").